**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA** : **3:CR-16-312**

         **v.** : **(JUDGE MANNION)**[1]

**MARK COOK,** :

    **Defendant** :

## M E M O R A N D U M

Presently before the Court are three Motions to Suppress Evidence (Docs. 120, 127 & 167), filed by Defendant Mark Cook through his former counsel, Attorney Bill Ruzzo. Cook's Request for a *Franks* Hearing, (Doc. 119), was granted. The pending motions have been fully briefed, and bifurcated suppression hearings were held on January 8, 2020 and March 11, 2021. As such, the motions are now ripe for disposition.

### I.   PROCEDURAL HISTORY

On October 25, 2016, a grand jury returned a multi-count Indictment against Defendant Cook in connection with his alleged involvement in drug trafficking and interstate prostitution. The indictment charged Defendant Cook with six criminal

---

[1] This case was reassigned to the undersigned United States District Court Judge following the passing of the Honorable James M. Munley.

counts, including one count of conspiracy to commit sex trafficking by force and coercion, three counts of sex trafficking by force and coercion, possession with intent to distribute heroin, and attempted witness tampering. (Doc. 1). On December 20, 2016, Defendant Cook was charged in a Superseding Indictment that added one count of sex trafficking by force and coercion, one count of attempted sex trafficking by force and coercion, one count of conspiracy to distribute cocaine, one count of wire fraud, and altered the time frame for the attempted witness tampering charge. (Doc. 42). On October 31, 2017, a Second Superseding Indictment charged Defendant Cook with an additional count of sex trafficking by force and coercion. (Doc. 97). It also changed the time period for the possession with intent to distribute charge and specified that at least five victims were involved in the conspiracy to commit sex trafficking charge. (Doc. 101).

On July 24, 2018, Defendant Cook was subsequently charged in a Third Superseding Indictment. (Doc. 179). The Third Superseding Indictment added three new victims to the conspiracy count, one new overt act, three new sex trafficking counts, a new charge of transporting an individual in interstate commerce for purposes of prostitution, a new charge of persuading an individual to travel in interstate commerce to engage in prostitution, and two new drug counts. (Id.).

2

More recently, on May 14, 2019, a Fourth Superseding Indictment was charged against Defendant Cook that further extended the time frame for the conspiracy count. (Doc. 233).

On February 2, 2018, Defendant Cook filed a motion for a *Franks* hearing, along with a brief in support thereof, with respect to the FBI's search of his residence on October 14, 2016. (Docs. 119, 119-1). The Government then filed a brief in opposition on February 13, 2018. (Doc. 121). Next, on February 6, 2018, Defendant Cook filed a motion to suppress evidence seized from his person and rental vehicle by Taylor, Pennsylvania, police on March 28, 2015. (Docs. 120, 120-1). The Government filed a brief in opposition on February 20, 2018, to which Defendant Cook filed a reply on April 13, 2018. (Docs. 122, 142).

Defendant Cook filed a second motion to suppress, as well as a supporting brief, on March 16, 2018 in relation to the evidence seized from the search of his cellphone. (Docs. 127, 128). Defendant Cook filed a supporting supplemental attachment on March 19, 2018, and the Government filed a brief in opposition on April 9, 2018. (Docs. 129, 135). Defendant Cook subsequently filed a reply brief on May 18, 2018. (Doc. 157). Then, on July 6, 2018, Defendant Cook filed an additional motion to suppress evidence and a *Franks* hearing request with respect to the search of his cellphone. (Doc. 167). The Government filed a brief in

opposition on August 17, 2018 and Defendant Cook filed a reply on September 19, 2018. (Docs. 187, 193).

On January 8, 2020, the Honorable James M. Munley held a suppression hearing on the defendant's motions that arose from the March 28, 2015 traffic stop. (Doc. 273). Upon the passing of Judge Munley, the undersigned subsequently held on March 11, 2021, the second half of the bifurcated proceeding, the *Franks* hearing, regarding the search warrant of Cook's residence, (Doc. 355), bringing this case to its present procedural posture.[2]

The trial in this case has been scheduled to being on June 14, 2021. (Doc. 334).

## II.    FINDINGS OF FACT[3]

During the suppression hearing held on January 8, 2020, the Court heard testimony from the following witnesses called by the Government: Officer Brian

---

[2] The court afforded both parties the opportunity to file supplemental briefs by March 26, 2021, regarding the March 11, 2021 *Franks* hearing. However, no additional briefs were filed. The court also notes that the transcript from the March 11, 2021 hearing has been filed. (Doc. 366).

[3] When ruling on a motion to suppress, the trial judge takes on the role of fact finder and thus "is responsible for assessing the credibility of the testifying witnesses, weighing the evidence, and reaching any 'inferences, deductions and conclusions to be drawn from the evidence.'" United States v. Cole, 425 F. Supp. 3d 468, 473 (W.D. Pa. 2019) (quoting United States v. Harris, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)).

Holland, of the Taylor, Pennsylvania, Police Department ("Officer Holland"); and Detective Sheryl Turner, of the Lackawanna County District Attorney's Office ("Detective Turner"). At the March 11, 2021 *Franks* hearing, three witnesses testified, namely, Heather Keith, Kathleen Healey, and FBI Agent McMillen. Two exhibits were admitted at the second hearing, namely, defendant Exhibit #1, McMillen's Affidavit, and defendant Exhibit #2, copies of FaceBook instant messages between Cook and Healey. The Court, having found these witnesses to be credible, makes the following factual findings based on their testimony, the evidence admitted at the suppression hearings, and the parties' briefs and supporting exhibits.

Officer Holland testified that on March 28, 2015, he was assigned to the Taylor Police Department's 10 P.M. to 6 A.M. shift as a patrol officer. (Doc. 273, at 5). During his shift, Officer Holland was in uniform and operated a marked patrol cruiser. (Id.) At approximately 3:00 A.M., Officer Holland observed a vehicle travelling without its tail lamps illuminated, in violation of Section 4302 of the Pennsylvania Motor Vehicle Code. (Id. at 6, 8). Officer Holland then initiated a traffic stop of the vehicle at the intersection of South Keyser Avenue and Union Street, which was a high-risk road. (Id. at 5, 10).

Officer Holland observed two people inside of the vehicle and notified the operator, identified as Defendant Cook, of the reason for the stop. (Id. at 5-6, 8).

5

Officer Holland then asked for Defendant Cook's license and registration and learned that he was operating a rental vehicle. (Id. at 8-9). Officer Holland further discovered that Defendant Cook had come from a nearby strip club known as the Diamond Club. (Id. at 9). Due to numerous drug arrests that occurred there, regular contact with gang members that frequented the establishment, and intelligence gathered by Pennsylvania State Police regarding the club, Officer Holland considered the Diamond Club to be a high-crime location. (Id. at 9-10).

As Officer Holland interacted with Defendant Cook, he used his flashlight to look inside of the rental vehicle. (Id. at 9). According to Officer Holland, he was searching the interior for weapons as a safety precaution. (Id.) Officer Holland then observed a bag of suspected marijuana on the floor of the vehicle, located directly behind the driver's seat. (Id. at 10-11). Based on this observation, Officer Holland requested backup law enforcement assistance. (Id.)

After Officer Zuby arrived at the scene, Officer Holland requested that Defendant Cook step out of the vehicle. (Id. at 11). Officer Holland testified that he made this request in order to recover the bag of marijuana that he had seen and to make sure that Defendant Cook was not carrying any weapons. (Id. at 12). Defendant Cook did not immediately comply with Officer Holland's request; when he did exit the vehicle, however, Officer Holland noticed Defendant Cook reach in the area of his waistband. (Id.) Based on this behavior, Officer Holland drew his

6

gun, secured Defendant Cook in handcuffs, and showed him the suspected bag of marijuana that he observed. (Id., at 12, 38).

Officer Holland subsequently conducted an initial search of Defendant Cook's person and discovered a L.G. cellphone with a red case and approximately $2,500 in United States currency. (Id. at 12-13). Officer Holland also requested to search Defendant Cook's vehicle, to which Cook consented. (Id. at 14). Officer Holland and Officer Zuby then proceeded to search the passenger compartment of the vehicle, followed by the trunk. In the trunk of the car, the officers located approximately $900.00 in counterfeit currency and three additional cellphones. (Id.) Upon discovering these phones, Officer Holland asked if they belonged to Defendant Cook. (Id. at 15). In reference to the red phone that Officer Holland had initially seized from his person, Defendant Cook confirmed that just that one device was his personal cellphone. (Id.)

Although Officer Holland asked Defendant Cook for consent to search the red cellphone, Defendant Cook did not provide it. (Id. at 16, 28-29). While attempting the place the red cellphone in airplane mode, Officer Holland inadvertently took several photos with the device, including a screenshot of its locked homepage. (Id. at 16-18, 29-30). After the traffic stop was completed, Officer Holland contacted Detective Turner about conducting a forensic analysis of Defendant Cook's cellphone. (Id. at 20). Officer Holland was unable to

7

immediately apply for a search warrant of the cellphone, however, Detective Turner informed him that the available extraction software, known as Cellebrite, was incapable of penetrating the device's security features without the actual passcode. (Id. at 20, 56-57).

During the January 8, 2020 suppression hearing, Detective Turner also provided expert witness testimony regarding the search and data extraction of Defendant Cook's cellphone. (Id. at 55). Detective Turner stated that Defendant Cook's cellphone was equipped with a knock lock, which was similar to a pattern code. (Id. at 56). When Officer Holland initially contacted her regarding the cellphone on or around March 30, 2015, Turner could not perform a lock bypass extraction with the Cellebrite software she possessed at the time. (Id.) She explained that other law enforcement agencies in the area were also unable to bypass the cellphone's lock feature, as they all had access to the same software as Detective Turner. (Id. at 56-57).

Cellebrite subsequently released a software update that included a lock bypass for the make and model of Defendant Cook's cellphone. (Id. at 57). Upon obtaining the software update, Detective Turner contacted Officer Holland about the development. (Id.) Shortly thereafter, on May 20, 2015, Detective Turner received and executed a search warrant that authorized the data extraction of Defendant Cook's cellphone. (Id.)

According to the extraction report, three photos were taken with Defendant Cook's cellphone at approximately 5:15 A.M., eastern standard time, on March 28, 2015. (Id. at 63). Detective Turner also stated that a screenshot of the cellphone's locked homepage had been taken at approximately 5:16 A.M., eastern standard time, the same day. (Id. at 64-65). Detective Turner testified, however, that the phone still had the ability to take photos while it was locked. (Id. at 67). Even though the phone could take photos, Detective Turner explained that this feature did not allow access to the cellphone's locked contents. (Id.) Detective Turner further confirmed that the device was locked when the screenshot was taken and that the text messages received after the cellphone's seizure remained unread. (Id. at 64-65).

## III.    LEGAL STANDARD

The court has jurisdiction over Defendant Cook's motions to suppress under 18 U.S.C. §3231. A criminal defendant brings a motion to suppress evidence under Federal Rule of Criminal Procedure 12(b)(3)(C), in an effort "to show that evidence against him or her was unconstitutionally obtained." U.S. v. Hernandez, 2015 WL 5123924, at *4 (M.D. Pa. 2015). Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

9

violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753–55 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). In order to establish standing under the Fourth Amendment to challenge a search, a defendant must show a "reasonable expectation of privacy" in the place or thing searched. Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978).

If standing is established, then the court examines the search warrant or lack thereof. The burden of persuasion depends on whether or not there was a warrant that authorized the search. See Hernandez, 2015 WL 5123924, at *4. Further, the Supreme Court regards exclusion of evidence as an "extreme sanction" that "should be ordered only on a case-by-case basis and only in those unusual cases

10

in which exclusion will further the purposes of the exclusionary rule," which center on deterring police misconduct. U.S. v. Leon, 468 U.S. 916, 918 (1984).

The Fourth Amendment lays out four requirements of a valid warrant. The warrant must: 1) be based on probable cause; 2) be supported by a sworn affidavit; 3) describe particularly the place of the search; and 4) describe particularly the persons or things to be seized. Groh v. Ramirez, 540 U.S. 551, 557 (2004).

"The Fourth Amendment requires that a search warrant be supported by probable cause, and '[e]vidence seized pursuant to a search warrant that is not so supported may be suppressed.'" U.S. v. Rivera, 524 Fed.Appx. 821, 825 (3d Cir. 2013) (citation omitted).

The district court conducts only a deferential review of the initial probable cause determination made by the magistrate [judge] regarding a search. U.S v. Stearns, 597 F.3d 540, 554 (3d Cir. 2010) (citing Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317 (1983)). "The role of a reviewing court is not to decide probable cause *de novo*, but to determine whether 'the magistrate [judge] had a substantial basis for concluding that probable cause existed.'" Id. (citation omitted). In order for the reviewing court to make this determination, it "must consider the totality of the circumstances, 'and need not conclude that it was more likely than not' that the evidence sought was at the place described." Rivera, 524 Fed.Appx. at 825 (citation omitted). "If a substantial basis exists to support the magistrate [judge]'s

probable cause finding, [the court] must uphold that finding ....” Stearns, 597 F.3d

at 554. In evaluating a search warrant application, “the magistrate [judge] must

‘make a practical, common-sense decision whether, given all the circumstances

set forth in the affidavit ... there is a fair probability that contraband or evidence of

a crime will be found in a particular place.’” Id. (citation omitted). A search warrant

can be issued even when supported by an affidavit which does not contain direct

evidence linking the crime with the place to be searched. Id. “Probable cause can

be, and often is, inferred from ‘the type of crime, the nature of the items sought,

the suspect’s opportunity for concealment and normal inferences about where a

criminal might hide [evidence].’” Id. (citation omitted). “[T]he resolution of doubtful

or marginal cases in this area should be largely determined by the preference to

be accorded to warrants.” U.S. v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993)

(citation omitted).

Generally, “the burden of proof is on the defendant who seeks to suppress

evidence.” U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted).

“However, once the defendant has established a basis for his motion, [], the burden

shifts to the government to show that the search or seizure was reasonable.” Id.

(citation omitted).

The court’s “role is not to make [its] own assessment as to whether probable

cause existed”, “[r]ather, [it is] constrained to determine only whether the affidavit

provides a sufficient basis for the decision the magistrate judge actually made." Jones, 994 F.2d at 1057. Thus, the district court's limited role is to determine if the four corners of the affidavit in support of the search warrant provided "the magistrate judge with a substantial basis on which to conclude that evidence of a crime would be found in the defendant['s] residence[]." Id. at 1055.


## IV.   DISCUSSION

As mentioned *supra*, Defendant Cook has filed the following pre-trial motions: (1) a motion to suppress evidence seized from Defendant Cook's person and rental vehicle by Taylor, Pennsylvania, Police on March 28, 2015, (Doc. 120); (2) a motion to suppress evidence seized from the search of Defendant Cook's cellphone, (Doc. 127); (3) a motion to suppress evidence and a *Franks* hearing request related to the search of Defendant Cook's cellphone (Doc. 167); and (4) a motion for a *Franks* hearing related to the FBI's search of his residence on October 14, 2016, (Doc. 119). Defendant Cook's motions to suppress contend that his Fourth Amendment rights were violated when Officer Holland unlawfully initiated a pretextual stop of his vehicle, conducted a search of his person and vehicle without valid consent, and tampered with his cellphone without obtaining a search warrant. Defendant Cook additionally asserts that requesting a search warrant of his

13

cellphone fifty-one (51) days after it was seized unreasonably infringed upon his possessory interests protected by the Fourth Amendment.

Defendant Cook's <u>Franks</u> motion alleges that the affidavit of probable cause supporting the search warrant for his residence in Scranton, PA, contained reckless misstatements and material omissions.

The Court will address each issue in turn.

## A. Motion to Suppress Evidence Seized from Defendant Cook's Person and Rental Car

In his first motion to suppress evidence, Defendant Cook seeks to suppress all evidence seized by the Taylor Police Department on March 28, 2015. Defendant Cook's motion rests on the claim that the initial traffic stop was unlawful and that he never validly consented to a search of the rental vehicle.[4] The Government responds that, as the arguments in Defendant Cook's motion fail, the suppression of evidence is not warranted.

### 1. Officer Holland lawfully stopped and detained Defendant Cook.

Defendant Cook's motion alleges that police engaged in an illegal traffic stop of his rental vehicle, as the car's taillights were in working order when Officer

---

[4] Defendant Cook's motion additionally seeks to suppress all evidence allegedly obtained through a warrantless search of his cellphone. (Doc. 120, at 3). As the Second Motion to Suppress Evidence Seized from Defendant Cook's Cellphone, (Doc. 167), more thoroughly addresses similar claims, the Court will consider this argument *infra*.

Holland pulled him over. (Doc. 120, at 2; Doc. 120-1, at 4). Defendant Cook further argues that Officer Holland exceeded the original scope of the stop and was more concerned with discovering contraband than investigating whether a traffic violation had occurred. (Doc. 142, 6-7). The Government contends that the issue is not whether Defendant Cook's rental vehicle had functioning taillights, but rather whether he had them turned on. (Doc. 122, at 6). The Government also submits that a police officer need only have reasonable, articulable suspicion that a traffic violation occurred in order to justify a traffic stop. (Id. at 4).

As discussed *supra*, the Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" U.S. v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)). Further, "[i]t is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997). "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006); United States v. Lewis, 672 F.3d 232, 237, 56 V.I. 871,

879 (3d Cir. 2012) ("[P]retextual traffic stops supported by reasonable suspicion do not run afoul of the Fourth Amendment.").

Upon review, the Court finds that the evidence presented at the January 8, 2020 Suppression Hearing supports the Government's position. Officer Holland credibly testified that he stopped Defendant Cook's vehicle on the basis that it did not have its taillights illuminated, in violation of the Pennsylvania Motor Vehicle Code.[5] (Doc. 273, at 8). Regardless of whether or not they were actually operational, Officer Holland's dashcam footage clearly shows that the rental vehicle's taillights were not turned on while Defendant Cook was driving or when he was pulled over. (Doc. 273, at 8; Gov. Ex. 1, at 3:07:54-3:08:19; Gov. Ex. 2).

---

[5] Section 4302 of the Pennsylvania Motor Vehicle Code, which governs the periods for requiring lighted lamps, provides:

(a) General Rule.--The operator of a vehicle upon a highway shall display the lighted head lamps ***and other lamps and illuminating devices*** required under this chapter . . . at the following times:
   ***(1) Between sunset and sunrise.***
   (2) Any time when the operator cannot discern a person or vehicle upon the highway from a distance of 1,000 feet due to insufficient light or unfavorable atmospheric conditions, including rain, snow, sleet, hail, fog, smoke or smog.
   (3) Any time when the vehicle's windshield wipers are in continuous or intermittent use due to precipitation or atmospheric moisture, including rain, snow, sleet or mist.
(b) Signal lights.--Stop lights, turn signals and other signaling devices shall be lighted as prescribed in this title.

75 Pa. Stat. and Cons. Stat. Ann. §4302 (emphasis added).

16

Accordingly, as Officer Holland had "probable cause to believe that a traffic violation occurred," his stop of Defendant Cook's rental vehicle was reasonable under the Fourth Amendment. See Whren v. United States, 517 U.S. 806, 810 (1996); Moorefield, 111 F.3d at 12.

Although Officer Holland initiated a valid traffic stop, the Court recognizes Defendant Cook's argument that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Indeed, "[i]f a seizure or detention is extended beyond what was authorized by the initial reasonable suspicion or probable cause, that extended seizure is unconstitutional absent additional reasonable suspicion of criminal activity." Davila v. N. Reg'l Joint Police Bd., 370 F. Supp. 3d 498, 514 (W.D. Pa. 2019) (citing Rodriguez v. United States, 575 U.S. 348 , 350 (2015) ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."); see also United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003) ("[A]n officer who develops a reasonable articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation. . .").

17

Here, Defendant Cook alleges that, based on his repeated visual inspection of the interior of the vehicle with his flashlight, Officer Holland exceeded the scope of the traffic stop by turning it into an investigatory stop. (Doc. 142, at 6-7). Defendant Cook further avers that, because Officer Holland "had by no means determined the existence of any contraband through plain view," he developed a fabricated reasonable suspicion to escalate the stop. (Id. at 7-9).

Based on the evidence of record, the Court is not persuaded by the Defendant's arguments. Officer Holland testified that, as a matter of safety, he looked inside the rental vehicle with his flashlight while speaking to Defendant Cook. (Doc. 273, at 9, 11). Contrary to Defendant Cook's position, this does not constitute an intrusive detour from the purpose of the stop that would run afoul of the Fourth Amendment. See Rodriguez v. United States, 575 U.S. 348, 357, 135 S. Ct. 1609, 1616 (2015) ("Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular."). Further, by using a flashlight to observe the interior of Defendant Cook's vehicle, Officer Holland did not infringe on any constitutionally protected interest. See Texas v. Brown, 460 U.S. 730, 739-40 (1983) (holding that an officer illuminating the inside of an automobile with a flashlight and changing his position to better observe the interior, "which may be viewed from outside the vehicle by

18

either inquisitive passersby or diligent police officers," did not implicate the defendant's Fourth Amendment rights).

Moreover, when Officer Holland observed a bag of suspected marijuana on the floor of the vehicle, he was entitled to expand to scope of the initial stop for further investigation of criminal activity. See Givan, 320 F.3d at 458. Officer Holland's observation was bolstered by the fact that, once Officer Zuby arrived at the scene, he immediately stated, "bag of weed on the ground", and directed his fellow officer to where it was located. (Doc. 273, at 12, Gov. Ex. 1 at 3:12:02). After exiting the vehicle, Defendant Cook even acknowledged that he was able to see the bag of marijuana that Officer Holland showed him inside the vehicle, which undermines the argument that it was not within plain view. (Id. at 3:14:14). Therefore, the Court finds that Officer Holland did not impermissibly exceed the scope of the traffic stop without a reasonable, particularized suspicion that Defendant Cook had also violated narcotics laws.

Since the initial traffic stop and continued detention of Defendant Cook was lawful under the Fourth Amendment, the suppression of evidence is not warranted here.

### 2. Officer Holland had probable cause to search Defendant Cook's rental vehicle.

Defendant Cook's suppression motion also challenges the constitutionality of the search of his rental vehicle. (Doc. 120-1, at 4). The Government argues that

the warrantless search of his vehicle was justified based on Defendant Cook's consent and under the automobile exception to the warrant requirement. (Doc. 122, at 10-11).

Warrantless searches of automobiles are generally *per se* unreasonable under the Fourth Amendment. U.S. v. Givan, 320 F.3d 452, 459 (3d Cir. 2003); Katz v. United States, 389 U.S. 347, 357 (1967). It is well settled, however, "that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). For a warrantless search to be valid on this basis, "[t]he government must prove that consent was 'freely and voluntarily given' and not mere acquiescence to 'a claim of lawful authority.'" United States v. Byrd, 388 F.Supp. 3d 406, 412 (M.D. Pa. 2019,) aff'd, 813 F. App'x 57 (3d Cir. 2020) (citing United States v. Price, 558 F.3d 270, 277-78 (3d Cir. 2009)).

Relatedly, "[t]he automobile exception permits vehicle searches without a warrant if there is 'probable cause to believe that the vehicle contains evidence of a crime.'" United States v. Donahue, 764 F.3d 293, 299-300 (3d Cir. 2014) (citations omitted). "If there is a 'fair probability' that evidence of a crime or contraband would be found in a vehicle, then probable cause to search the vehicle exists." Byrd, 388 F. Supp. 3d at 413–14 (M.D. Pa. 2019) (citing Donahue, 764

F.3d at 301). "Whether probable cause exists is an *objective* determination based on the totality of the circumstances present at the time of the search." Id. (citing United States v. Williams, 413 F.3d 347, 353 n.6 (3d Cir. 2005)). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825 (1982).

Here, upon questioning Defendant Cook in relation to the traffic stop, Officer Holland testified that he observed a bag of marijuana on the floorboard of the vehicle's backseat. (Doc. 273, at 11). After Defendant Cook eventually exited the vehicle, Officer Holland stated, "obviously you don't mind if I look in the rest of your car?" (Id., Gov. Ex. 1 at 3:15:52). Defendant Cook, while in restraints, subsequently responded, "I don't mind at all." (Id. at 3:15:54). Upon seeing the marijuana in plain view, however, Officer Holland testified that he believed he had probable cause to search the vehicle even without receiving Defendant Cook's consent. (Id. at 14).

After careful review, regardless of whether the warrantless search of the rental vehicle was justified based on Defendant Cook's permission, the Court finds that Officer Holland conducted a valid search of the vehicle pursuant to the automobile exception. Once Officer Holland observed the bag of suspected marijuana in plain view on the floor of the rental vehicle, he developed probable cause to search the vehicle for further evidence of illegal narcotics. See Donahue

764 F.3d at 300 (holding that if a warrantless search is valid under the automobile exception, law enforcement is also justified in opening bags contained in the vehicle's trunk). The fact that Officer Holland was also aware that Defendant Cook had come from an establishment that he considered to be a high crime location, namely, the Diamond Club, further objectively supports his probable cause determination.

Accordingly, the Court finds that the Government has met its burden of showing that suppressing the evidence obtained as a result of the warrantless search of Defendant Cook's rental vehicle[6] is not warranted.

### 3. The Search Warrant authorizing a search of Defendant Cook's cellphone was supported by probable cause.

Next, Defendant Cook argues that the evidence seized from a search of his cellphone should be suppressed based on alleged defects in the search warrant's

---

[6] The Court notes that Defendant Cook appears to contest, for the first time, the validity of the search of his person in his reply brief. (Doc. 142, at 10-15). Specifically, Defendant Cook challenges the necessity of placing him in handcuffs upon exiting the vehicle and alleges violations of the standards for a Terry frisk. (Id.) Notwithstanding any procedural issues involving waiver, the Court finds Defendant Cook's argument to be without merit. Even if Officer Holland exceeded the scope of an initial Terry pat down, any items recovered would have been inevitably discovered during a search of Defendant Cook's person incident to a lawful arrest, which occurred shortly thereafter. See United States v. Herrold, 962 F.2d 1131, 1140 (3d Cir. 1992) ("[T]he inevitable discovery doctrine . . . permits the introduction of evidence that *inevitably would have* been discovered through lawful means, although the search that actually led to the discovery of the evidence was unlawful.") (emphasis in original).

supporting affidavit of probable cause. (Doc. 120, at 2-3; Doc. 120-1, at 2-3). A district court conducts only a deferential review of the initial probable cause determination made by the Magistrate Judge regarding a search. U.S v. Stearns, 597 F.3d 540, 554 (3d Cir. 2010) (citing Illinois v. Gates, 462 U.S. 213, 236 (1983)). Indeed, "[t]he role of a reviewing court is not to decide probable cause *de novo*, but to determine whether 'the magistrate [judge] had a substantial basis for concluding that probable cause existed.'" Id. (citation omitted). "If a substantial basis exists to support the magistrate [judge's] probable cause finding, [the court] must uphold that finding . . . ." Id.

Doubtful or marginal cases should be "largely determined by the preference to be accorded to warrants." Id. (citation omitted). In evaluating a search warrant application, "the magistrate [judge] must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. (citation omitted). A search warrant can be issued even when supported by an affidavit which does not contain direct evidence linking the crime with the place to be searched. Id. "Probable cause can be, and often is, inferred from 'the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence].'" Id. (citation omitted).

23

Mindful of the deferential standard of review, the Court finds that the search warrant application provided the issuing magistrate judge with a substantial basis for concluding that a search of Defendant Cook's cellphone would elicit evidence of a crime. For example, the supporting search warrant papers detailed how a bag of suspected marijuana was observed in plain view on the floor of Defendant Cook's rental car, how a search of Defendant Cook's person resulted in the seizure of large amounts of currency and other controlled substances, and how the discovery of four cellphones supported the allegation that Defendant Cook was engaged in the business of drug distribution. (Doc. 122, at 18-39).

Accordingly, Defendant Cook's probable cause challenge is without merit. The Court therefore concludes that the evidence obtained from the search of Defendant Cook's cell phone is not subject to suppression based on any purported deficiencies in the search warrant.[7]

---

[7]In a separate motion, Defendant Cook requests a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), related to the search warrant for his cell phone. (Doc. 167). Under Franks, a defendant is entitled to a hearing if he makes a substantial preliminary showing that an officer knowingly and intentionally made a false statement in a search warrant affidavit, with reckless disregard for the truth, and that the challenged statement was necessary to support a finding of probable cause. 438 U.S. at 155-56. As relevant here, Defendant Cook argues that Officer Holland engaged in the following conduct to unlawfully secure the search warrant for the cellphone: (1) falsely stated that he seized a cellphone from Defendant Cook's person, instead of from the rental vehicle where the cellphones were found; and (2) made material omissions regarding his lack of knowledge as to whom the cellphones in the vehicle belonged. (Doc. 167-1, at 11-30). Defendant Cook further claims that Officer Holland lied about the location of the seized evidence in order

### B. First Motion to Suppress Evidence Seized from Defendant Cook's Cellphone

In his next motion to suppress, Defendant Cook claims that the lapse of time between the seizure of his cellphone on March 28, 2015, and the request for a search warrant on May 20, 2015, was unreasonable under the Constitution. (Doc. 127, at 1). Specifically, Defendant Cook asserts that the fifty-one-day delay improperly infringed upon his possessory interests as protected under the Fourth Amendment. (Doc. 128, at 2). In response, the Government attributes the delay in obtaining a search warrant to the cellphone's security features and the need to procure special software in order to extract its data. (Doc. 135, at 8). Based on the fact that police did not have access to this extraction software at the time the cell phone was seized, Defendant Cook's diminished possessory interest in his phone while incarcerated, and the small nature of the Taylor Police Department, the Government further argues that the delay was justified. (Id.)

---

to create a false nexus between Defendant Cook and the phones found within the rental vehicle. (Id. at 25).

Despite these arguments, Officer Holland testified that, during the initial search of Defendant Cook's person, he discovered a black L.G. cellphone with a red case. (Doc. 273, at 13). Upon retrieving this cellphone from Defendant Cook's person, he placed it on the trunk of the rental vehicle. (Id. at 14). As the search progressed, and three other cellphones were found, Officer Holland testified that Defendant Cook subsequently referred to the first, red cellphone as his personal device. (Id. at 15). Moreover, the evidence information sheet from when Officer Holland entered the seized items into evidence clearly stated that he recovered the cellphone at issue from Defendant Cook's person. (Doc. 187, at 25). Therefore, the Court holds that relief pursuant to Franks is unwarranted here.

As explained by the United States Supreme Court, "a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration . . . ." Segura v. U.S., 468 U.S. 796, 812 (1984). In considering whether a delay was reasonable, the court should weigh the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983). No bright-line rule exists, however, for when a seizure becomes constitutionally unreasonable. United States v. Carey, 2020 WL 59607, at *2–3 (M.D. Pa. Jan. 6, 2020).

Upon balancing Defendant Cook's possessory interest in his cellphone with the Government's interest in its seizure, the Court does not find that the fifty-one-day delay in applying for a search warrant was unreasonable. Defendant Cook's possessory interest in the cellphone was minimal, as he was incarcerated immediately after its seizure, remained in prison during the full period of its retention, and had no right to physically possess the cellphone while he was in prison. The fact that Defendant Cook did not request the cellphone's return during the contested fifty-one-day period further undermines his position that he had a substantial possessory interest in the item. See United States v. Stabile, 633 F.3d 219, 235-36 (3d Cir. 2011) (noting the defendant's possessory interest in his computer hard drives was not substantial when he did not ask for their return drives

26

until eighteen months after their seizure); <u>United States v. Johns</u>, 469 U.S. 478, 487 (1985) (defendants who "never sought return of the property" cannot argue that the delay adversely affected their Fourth Amendment rights); <u>United States v. Burgess</u>, 576 F.3d 1078, 1097 (10th Cir. 2009) (delayed search not unreasonable because the defendant had "not identified any prejudice from the delay and the only readily apparent concern is that [defendant] was temporarily denied access to his property.").

Additionally, although Defendant Cook seemingly alleges that the Government was not diligent in pursuing its investigation, the Court is not persuaded by this contention. (Doc. 128, at 7-10; Doc. 157, at 15-22). Detective Turner testified that as of March 30, 2015, when Officer Holland initially contacted her about performing a search of Defendant Cook's cellphone, her department did not have access to software that could bypass the cellphone's lock code. (Doc. 135, at 8; Doc. 273, at 56). Upon receiving updated software that allowed for information to be extracted from the cellphone, however, Detective Turner promptly notified Officer Holland of this development. (Doc. 273, at 20-21, 57-58). Within two days of being contacted by Detective Turner, Officer Holland applied for the search warrant for the cellphone. (<u>Id.</u>)

Accordingly, the Court concludes that the search of the cellphone fifty-one days after its seizure was reasonably timely under the circumstances and will therefore deny Defendant Cook's motion to suppress on this ground.

### C. <u>Second Motion to Suppress Evidence Seized from Defendant Cook's Cellphone</u>

In the second motion to suppress evidence seized from his cellphone, Defendant Cook alleges that police officers violated his Fourth Amendment rights by conducting a warrantless search of his cellphone. (Doc. 167). The Government contests that they had access to the contents of the cellphone at the time of the traffic stop, let alone the ability to bypass the phone's security system before obtaining a search warrant. (Doc.187, at 12-15).

Pursuant to <u>Riley v. California</u>, 573 U.S. 373, 386 (2014), police must generally obtain a search warrant prior to searching a cellphone seized from an individual who has been arrested. Here, Defendant Cook asserts that Officer Holland ran afoul of this mandate when, without a warrant, he searched the contents of the cellphone until he accidentally locked himself out of the device. (Doc. 167-1, at 5-6). Defendant Cook also avers that Officer Holland personally utilized the cellphone, as evidenced by the fact that several photographs were taken on the device following its seizure. (<u>Id.</u>). Defendant Cook additionally submits that, based on a screen shot taken on the cellphone, law enforcement tampered

with the device in an attempt to access its information without a warrant or his consent. (Id. at 6-7).

Upon careful review, the Court finds that the evidence of record belies Defendant Cook's allegations. Testimony from the January 8, 2020 suppression hearing revealed that Officer Holland requested Defendant Cook's permission to search the cellphone at issue, which Defendant Cook denied. (Doc. 273, at 16). Officer Holland further explained:

> When [Defendant Cook] refused consent, I brought the phone over to the table where I kept the rest of the evidence. At the time the practice for these phones was to place them in airplane mode so they could not be remotely accessed by a third party compromising the evidence on that phone. Airplane mode blocked that signal. I was trying to do that on the phone, which I was not familiar with.

(Id. at 16-17).

Officer Holland also denied that he intentionally took photos with the device; to the contrary, his testimony shows that he inadvertently took photos with the cellphone while attempting to secure it in airplane mode. (Id. at 17-18). Additionally, Officer Holland testified that, prior to obtaining a search warrant for the device, he did not gain access to its contents, look through its photo gallery or call logs, or see anything other than the phone's home screen. (Id. at 18, 49-50).

The testimony of Detective Turner further supports the Government's arguments. As recounted *supra*, Detective Turner indicated that, based on its make and model, it was impossible to access Defendant Cook's cellphone without

29

its passcode. (Id. at 56). It was not until Cellebrite released a software update that law enforcement had the ability to bypass the cellphone's lock feature. (Id.). The data extracted from Defendant Cook's cellphone also substantiates Officer Holland's testimony that he did not review its text message history, as the evidentiary log demonstrates that all text messages received after the traffic stop were unread. (Id. at 65-66). Moreover, given the cellphone's lock feature, Detective Turner confirmed that the device was locked at the time the screenshot of its home screen was taken. (Id. at 65).

Defendant Cook's counsel did not present evidence to refute the testimony of either Officer Holland or Detective Turner at the suppression hearing with respect to their handling of the cellphone; specifically, that law enforcement did not have access to, or otherwise attempt to access, the data stored in Defendant Cook's phone without first obtaining a warrant. The fact that Officer Holland inadvertently took photos with Defendant Cook's cellphone does not support the conclusion that he bypassed its security features or otherwise was privy to its contents. Therefore, the Court is not persuaded by the unsubstantiated allegation that the Government performed an illegal search of Defendant Cook's cellphone under the Fourth Amendment.

Since the Court concludes that the Government did not search Defendant Cook's cellphone prior to obtaining a valid search warrant, the Court declines to suppress the evidence obtained as a result of its forensic examination.

### D. **Motion for a *Franks* Hearing related to the search warrant for Defendant's Cook's Residence**

Defendant Cook, through Attorney Ruzzo, also filed a Motion for a *Franks* Hearing regarding the October 14, 2016 search of his residence in Scranton, Pennsylvania. (Doc. 119). Specifically, Defendant Cook alleges that the Affiant on the Affidavit of Probable Cause (the "Affidavit"), FBI Special Agent Shawn B. McMillen ("Agent McMillen"), intentionally and/or recklessly made certain false statements and material omissions in order to secure the search warrant of his residence. (Doc. 119-1, at 2). Defendant Cook further argues that any statements and evidence seized as a result of the search of his residence should be suppressed. (Id.). The Government responds that Defendant Cook's motion cherry picks words and phrases out of context and generally rests on mischaracterizations of the evidence and minor inconsistencies. (Doc. 121, at 2).

The Court conducted a *Franks* hearing on March 11, 2021. A hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), is held to determine whether a police officer made false statements in an affidavit used to obtain a search warrant that yields incriminating evidence.

31

Specifically, as the court in <u>U.S. v. Briggs</u>, 2021 WL 915940, *5 (E.D. Pa. March 10, 2021), recently explained:

> Pursuant to <u>Franks v. Delaware</u>, criminal defendants may challenge the veracity of factual representations made in an affidavit upon which a magistrate [judge] relied in issuing a warrant. 438 U.S. 154, 172 (1978). In order to overcome the general presumption of validity attendant to search warrant affidavits and compel an evidentiary hearing, the defendant must make a "substantial preliminary showing" that the affidavit contained false statements of material fact made knowingly or with reckless disregard for the truth. <u>United States v. Yusuf</u>, 461 F.3d 374, 383 (3d Cir. 2006). The defendant must predicate their attack on "more than a mere desire to cross examine." <u>Franks</u>, 438 U.S. at 171. These allegations must be supported by accompanying offers of proof, such as sworn affidavits "or otherwise reliable statements of witnesses." <u>Id</u>. Mere allegations of negligence or error fall short of a substantial preliminary showing. <u>See</u> <u>Franks</u>, 438 U.S. at 165. The defendant must challenge the affiant's state of mind, and allege that the affidavit contains intentional falsehoods or statements that the "officer has obvious reasons to doubt," or omissions of fact that "any reasonable person would want to know." <u>See</u> <u>Yusuf</u>, 461 F.3d at 383 (citing <u>Wilson v. Russo</u>, 212 F.3d 781, 783 (3d Cir. 2000)).

"Even if the defendant makes this requisite showing, no hearing is required if, after the allegedly false material is stricken from the affidavit, there remains a sufficient basis for finding probable cause." <u>Id</u>. (citing <u>Franks</u>, 438 U.S. at 172). If the defendant is afforded a *Franks* hearing, he must "prove, by a preponderance of the evidence: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination." <u>Id</u>. (quoting <u>Yusuf</u>, 461 F.3d at 383 (citing <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 399 (3d Cir. 1997)). "If the

32

defendant meets this burden, 'the Fourth Amendment requires that…the fruits of the search [be] excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" Id. (quoting Franks, 438 U.S. at 155-56).

In his *Franks* motion, Defendant Cook raises four (4) points of contention with Agent McMillen's averments in his Affidavit. Specifically, Defendant Cook argues that Agent McMillen:

- (1) Falsely stated that Defendant Cook forced confidential witness #1 ("CW #1") into prostitution when she arrived in Wilkes Barre in April of 2015, as Defendant Cook had been jailed since his arrest by Taylor Pennsylvania Police on March 28, 2015.

  - The Government responds that there was no intentional or reckless falsehood/omission in the Affidavit, as Agent McMillen truthfully disclosed the substance of CW #1's interview statements to the U.S. Magistrate Judge. The Affidavit further provided that Defendant Cook had been arrested on March 28, 2015 and subsequently imprisoned.

- (2) Failed to inform the U.S. Magistrate Judge that CW #1 was either lying or mistaken when she claimed that Defendant Cook forced her into prostitution, kept her money, and gave her drugs. Defendant Cook argues that he could not have engaged in such conduct while incarcerated, and that phone conversations when he was in Lackawanna County Prison between him and CW #1 (to which Agent McMillen had access) refute these contentions. Specifically, Defendant Cook asserts that he discouraged CW #1 from using drugs and that her conduct did not suggest that she was not free to leave him. Defendant Cook similarly argues that "CW #1's visit and conversation with [him]" belies her statement that Defendant Cook forced her to perform oral sex on him.

33

- o The Government notes that Defendant Cook fails to mention how CW #1 advised Agent McMillen that Heather Keith[8] had recruited her to work as a prostitute for Defendant Cook.

- o The Government additionally argues that Agent McMillen had not listened to Defendant Cook's prison phone calls with CW #1 prior to drafting the Affidavit, but that the contents of some conversations between them (as well as between Defendant Cook and Ms. Keith) nonetheless show how he intimidated and exerted control over her.

- o The Government submits that Defendant Cook has not offered anything specific to refute CW #1's statement regarding oral sex. Even if this statement had been removed from the Affidavit, the Government contends that it would not have impacted the U.S. Magistrate Judge's finding of probable cause.

- (3) Recklessly disregarded the truth of, or intentionally misled the U.S. Magistrate Judge regarding, the statements of confidential witness #2 ("CW #2"). In particular, Defendant Cook challenges the Affidavit's portrayal of the following statements made by CW #2, which he claims were either taken out of context or contradicted by the records of their conversations: that she started to work as a prostitute for Defendant Cook because she was "basically homeless" and he took advantage of her situation; that Defendant Cook was a "vicious person"; that she did not feel free to leave Defendant Cook; and that Defendant Cook pressured her to recant her statement to law enforcement that Defendant Cook had assaulted her. Defendant Cook also points to certain inconsistencies in CW #2's statements, which purportedly go toward CW #2's "credibility and reliability," in support of his argument that Agent McMillen intentionally included false information in the Affidavit.

  - o The Government answers that Defendant Cook's argument is meritless, as the cherry-picked excerpts of the conversations that he cites to do not contradict CW #2's descriptions. The Government again submits that even if the challenged statements were excised, the Affidavit would still be supported by probable cause.

- (4) Recklessly disregarded the truth of confidential witness #3's ("CW #3") statement that she feared retribution from Cook, who had exploited her drug addiction to get her to work as a prostitute for him. In support, Defendant Cook points to conversations between him and CW #3 that demonstrated his

---

[8] Heather Keith also worked as a prostitute for Defendant Cook.

efforts to prevent her from using drugs and to encourage her to seek treatment.

- o The Government argues that the conversations Defendant Cook references are ultimately consistent with CW #3's other statements in the Affidavit; namely, that Defendant Cook sometimes fed the addictions of the women that worked for him, and other times discouraged them when such addictions interfered with the women's work.

At the March 11, 2021 *Franks* hearing, the first witness to testify for the defendant was Heather Keith.[9] Keith met Cook in the beginning of 2015 when she was working as a prostitute on Backpage.com and Cook reached out to her on the website. She then had a relationship with Cook in February and March of 2015.

---

[9]At the March 11, 2021 hearing, the defendant was represented by his new and 5th appointed counsel, Stephanie Cesare, Esq. The defendant's initial witness he sought to call at the hearing was Kristen Strouse, who allegedly would have testified that some of the averments made against Cook in McMillen's October 14, 2016 Affidavit of Probable Cause in support of the Search Warrant for Cook's house were not true. Strouse was purportedly CW #3 identified in the Affidavit at pages 23-24, 27, D Ex. 1, and was alleged to be one of Cook's prostitutes who he paid only with cocaine and was allegedly subjected to physical force and threats of force from Cook. Defendant claimed that Strouse would have disputed some of the averments in the Affidavit if she was interviewed by investigators and that she was known to investigators. The government objected to allowing Strouse testify arguing that her testimony was not relevant because she did not provide any information to agents and that by the time McMillen found out where Strouse was, he had already submitted his Affidavit. The court granted the government's motion and did not permit Strouse to testify since she was not specifically mentioned in the Affidavit and she was not interviewed by McMillen for his Affidavit. Thus, the court concluded that Strouse was not a relevant witness for the *Franks* hearing and that even if references to CW #3 were removed from the Affidavit, there was still overwhelming evidence of probable cause for issuance of the search warrant based, in part, on the witnesses who McMillen did interview.

Eventually, Cook was arrested and incarcerated. Keith was later interviewed by agents, including McMillen, regarding a man named Thurman Stanley who Keith had worked for as a prostitute. At the time of her interview in about March of 2016, Keith was incarcerated in Susquehanna County Prison. Keith told agents that she had worked as a prostitute for about 10 years prior to her relationship with Cook, and that she and another girl named Lindsey Baxter worked for Stanley.

Keith was then shown a photo of Cook and she identified him. Keith told the agents that Cook was a good friend of hers and that she had a sexual relationship with him. Keith stated that she was with Cook in 2015 when he was arrested for possession of MDMA, molly, when they were leaving the Diamond Strip Club in Taylor, Pennsylvania. Keith also told agents that she and another female went to Connecticut with Cook to gamble. At the time of the trip, Keith had an advertisement on Backpage.com to be an escort under the name Tiffany, and that while she was in Connecticut she performed two "out-calls." She told agents that Cook did not know about her out-calls.

When Keith was not in prison she communicated with Cook by texting him from her cell phone and he would text her back, and by using FaceBook instant messenger. During the time she was in prison, Keith would call Cook on the telephone.

36

Keith also told agents about her relationship with Cook as well as about Lindsey Baxter. She told agents that Baxter only knew Cook about one day, which was the night before Cook was arrested at the Diamond Club.

Keith stated that when she met with agents in March 2016 during her incarceration at Susquehanna County Prison, she did not believe that the agents made any promises to her to say certain things or to cooperate with them.

As his second witness, Cook called Kathleen Healey. Healey first met Cook when she worked with him in about 2006 at a telemarketing company, I.M.S. Eventually, Healey had a sexual relationship with Cook. Sometime after their relationship ended, Cook became incarcerated, and Healey was interviewed by agents in about September of 2016, as part of the investigation into Cook. At the time of her interview, Healey had bruising, swelling and abrasions on her face, and she told agents that Cook had caused her injuries. She told agents that she had known Cook for about 13 years but she did not tell agents that she knew him as a drug dealer. Rather, Healey told agents that she knew Cook from working with him and then from "hooking up with him", i.e., having a sexual relationship with him. Healey stated that she did not tell agents that she knew Cook was a pimp since about May of 2016. However, she indicated that since June 1, 2016, she told agents that Cook was her pimp. She also told agents that on May 3, 2016 she and Cook began to message each other on FaceBook.com. Healey then told agents

that on May 17, 2016, she had a falling out with her family and met Cook at the Mohegan Sun Casino and, that she stayed with him at the Casino's hotel. Healey told agents that it was during their stay at the Casino hotel that Cook asked her to work as a prostitute for him. She said that Cook took advantage of her circumstances since she was homeless at that time and needed a place to stay.

On June 1, 2016, Healey stated that she started to work as a prostitute for Cook. Healey also told agents that she never wanted to be a prostitute before being one for Cook and that she did not want to work as a prostitute, but she felt that it was her only option at the time. Further, Healey stated that Cook knew she did not want to be a prostitute. Healey told agents that Keith also worked as a prostitute for Cook as well as Jacqueline Parker Graham and Kristen Strouse.

Additionally, Healey told agents that none of the females were allowed to keep any of the proceeds they received from prostitution and that Cook insisted they give all their money to him. She told agents that Cook supplied her with drugs on occasion and that he paid one installment of her child support payments. Healey also told agents that Cook made numerous false promises about taking care of the money she made working for him for the future.

Healey further told agents that Graham was addicted to cocaine and that Cook paid her for her prostitution activity with cocaine to fuel her addiction, and that Strouse was addicted to heroin and that Cook paid her with heroin to fuel her

addiction. However, Healey did not tell agents that Cook only paid Strouse with heroin, and she did not know if Cook paid Keith for working as a prostitute. Healey advised agents that Keith was Cook's girlfriend, that she was a heroin and crack addict, and that Cook would not let Keith use these two drugs, but that Cook gave Keith molly on occasion.

Healey further elaborated on Cook's activities and told agents she was with Cook when he bought heroin, cocaine and crack from two men in Dickson City, PA. Healey also detailed how the rooms were rented out for prostitution activities conducted for Cook as well as the different hotels she worked out of, and how the prostitution activities were carried out. She told agents about who supplied the money to run the prostitution activities, about how all of the business operation was paid for, and the details of how the operation was run.

On September 3, 2016, and into the next morning, Healey told agents that after she informed Cook she did not want to be a prostitute for him any longer, they had an argument and that he assaulted her by smothering her with a pillow, bruising her face, and choking her until she was unconscious. After this incident, Healey left for the Red Carpet Inn and packed her belongings. Cook then arrived at the Inn and Healey stated that Cook attempted to have sex with her in hopes that she would not report the assault incident to law enforcement. Healey then left the Inn and went to her mother's Scranton house. However, Healey did not go

immediately to the police or to the hospital for treatment. Rather, she went to the GCMC hospital in Scranton on September 5, 2016, for treatment and she met with an officer and filed assault charges against Cook. Healey told agents that this was the only time Cook assaulted her but she saw him grab his other prostitutes. She also indicated to agents that she never felt free to leave Cook because he was a "vicious person."

Healey allowed agents to view her cell phone and her advertisements from Backpage.com, and allowed them to view her FaceBook pages in which she had conversations with Cook. She admitted that after Cook assaulted her she continued to have communications with Cook on FaceBook.

As his final witness, Cook called FBI Agent McMillen to testify. McMillen verified his October 14, 2016 Affidavit of Probable Cause which was marked as D Ex. 1. Prior to signing his Affidavit, he interviewed Healey, Parker and Tammy Speaks. McMillen was aware of an interview with Baxter but he did not interview her. He also had an email from the Groton Township police stating that Cook, Keith and another person were stopped in the Connecticut Township. He also reviewed two FaceBook accounts of Cook and two accounts of Healey before he filed his Affidavit. In particular, McMillen reviewed conversations between Cook and Healey in their FaceBook accounts and, the records of their conversations were marked

40

as D Ex. 2. McMillen may have also reviewed Healey's cell phone prior to drafting his Affidavit.

In one FaceBook conversation between Cook and Healey, McMillen averred in his Affidavit that Cook was trying to get Healey to recant her statement about the assault incident. He also admitted that on September 20, 2016, Healey sent a message to Cook asking him if he found her driver's license and Cook responded "no love." McMillen stated that he copied some excerpts from the FaceBook accounts between Healey and Cook and included them in his Affidavit but that he did not include all of the messages, including messages in which they expressed their love to each other and messages in which Healey was trying to get Cook to go to her house for sex. Since the entire FaceBook messages are contained in D Ex. 2, they are not repeated. (See also Doc. 336 at 49-52).

McMillen testified that he reviewed the stated messages before preparing his Affidavit but that he did not believe that omitting the stated portions of the FaceBook messages added any context to his Affidavit since he construed those messages as an attempt by Cook to get Healey to recant her assault charge pending against him.

Further, McMillen stated that he received numerous transcripts of phone conversations between Cook and Healey when Cook was in Lackawanna County Prison however, he did not get those records until after his Affidavit was drafted.

41

Following the conclusion of McMillen's testimony, Cook did not call any other witness and the government did not call any witness or submit any evidence.

After the hearing both of defendant's Exhibits, 1 & 2, were admitted. (Doc. 366 at 54).

As mentioned, this court's review of the magistrate judge's probable cause determination regarding the search of defendant's residence is confined "to the facts that were before the magistrate judge, *i.e.*, the affidavit, and [the court does] not consider information from other portions of the record." Jones, 994 F.2d at 1055. Further, the Third Circuit has extended the right to a *Franks* hearing "to permit challenges based on factual omissions from the warrant affidavit." U.S. v. Heilman, 377 Fed.Appx. 157, 177 (3d Cir. 2010) (citation omitted). "[O]missions are made with reckless disregard for the truth 'if an officer withholds a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know.'" U.S. v. Romeu, 433 F.Supp.3d 631, 644-54 (M.D. Pa. 2020) (citation omitted). Further, there are two ways to determine whether conduct was reckless, "either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind." United States v. Brown, 631 F.3d 638, 645 (3d Cir. 2011).

Thus, pursuant to Franks, 438 U.S. at 155-56, "when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause." U.S. v. Wade, 956 F.Supp. 2d 638, 649 (W.D. Pa. 2013).

The court has considered the above stated four points of contention with Agent McMillen's averments in his Affidavit that Cook raised in his *Franks* hearing motion. The court finds that Cook has failed to prove by a preponderance that McMillen "knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant," and, "that the false statement or omission was material to a finding of necessity." Romeu, 433 F.Supp.3d at 645 (citation omitted). The minor inconsistencies Cook's counsel addressed during the hearing, (see Doc. 366 at 54-56), clearly did not contradict the Affidavit and did not show that false statements were made in the Affidavit. Cook also failed to meet his burden to show that the allegedly false statements, such as what drugs were provided to which prostitute, were necessary to the finding of probable cause since the gist of the averments were that Cook paid the prostitutes with drugs at times and that he used drugs to control the girls, but if the preferred addicted drugs were hindering the girl's work, he would give them other types. See Heilman, 377 Fed.Appx. at 180 ("a substantial showing" for

a *Franks* hearing requires that defendant show that a false statement was made, that the statement was made knowingly, intentionally, or with reckless disregard for the truth, and is "necessary to the [probable cause] finding) (citation omitted); U.S. v. Aachen, 658 F.Supp.2d 654, 659-60 (W.D. Pa. 2009) (the defendant is required to establish that "the challenged affidavit contained a statement that was deliberately false or showed a reckless disregard for the truth, and that such statement was material to a finding of probable cause.") (citation omitted).

The additional portions of the FaceBook messages between Healey and Cook defense counsel argued should have been included in the Affidavit to put their conversations in proper context do not alter the fact that Cook was seeking Healey to recant her statement to police about the assault incident. The fact that they messaged each other and expressed their love for one another does not add any meaningful context to McMillen's Affidavit. Also, even if the additional messages were included, they would not alter the overwhelming probable cause that was detailed in the Affidavit. In short, Cook had failed to prove that McMillen knowingly or recklessly included any false statement or omission that was necessary to the finding of probable cause.

In this case, Cook has not demonstrated that "the purported [misrepresentations by McMillen] are necessary to a finding of probable cause in light of the plethora of available corroborating evidence." Aachen, 658 F.Supp.2d

44

at 660. Also, similar to <u>Aachen</u>, Cook merely "highlights minor and/or inconsequential discrepancies that are insufficient to overcome the presumption of validity with respect to the Affidavit[ ]in support of the Warrant[]." <u>Id</u>.

The court also finds that assuming *arguendo* that Cook has satisfied his burden, and he clearly did not, and the court excises the alleged false statements and omissions from the 47-page Affidavit, D Ex. 1, the corrected Affidavit would have an abundance of remaining evidence to establish probable cause for the search warrant issued for Cook's house.

Based on the evidence and testimony presented at the *Franks* hearing, the court finds that McMillen did not knowingly or in reckless disregard for the truth make any false statements or make any omissions in his Affidavit used to obtain a search warrant of Cook's residence.

## V.    CONCLUSION

For the aforementioned reasons, and after conducting an evidentiary hearing, Defendant Cook's suppression motions, **(Doc. 120, 127, 167)**, will be **DENIED**. Additionally, Defendant Cook's motion to suppress evidence obtained from his house based on an Affidavit of Probable Cause in which he alleges that the agent knowingly or intentionally or with reckless disregard for the truth asserted

and omitted facts, following a *Franks* hearing, **(Doc. 119)**, will be **DENIED**. An appropriate Order follows.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Court**

**Dated: April 19, 2021**
**16-312-02**